Norman R. SCARBERRY, Plaintiff-
Libellant,

v.

The OHIO RIVER COMPANY, a Corpo-
ration, Defendant-Respondent.

Civ. A. No. 1147, Admiralty No. 1148.

United States District Court
S. D. West Virginia,
at Huntington.

April 25, 1963.

James P. Gill, Pittsburgh, Pa., and Arthur N. Smith, Jr., Charleston, W. Va., for plaintiff-libellant.

Campbell, McNeer, Woods, Bagley & Emerson, Charles F. Bagley, Huntington, W. Va., and Rose, Houston, Cooper & Schmidt, Harold R. Schmidt, Pittsburgh, Pa., for defendant-respondent.

HARRY E. WATKINS, District Judge.

This action is brought under the Jones Act (46 U.S.C.A. § 688) to recover for personal injuries sustained by plaintiff. The complaint alleges negligence on the part of the defendant, and is also brought under general maritime and admiralty law for unseaworthiness, and for maintenance and cure. The claim for maintenance and cure was settled for the sum of $4,070.00 during the trial, but all other issues of law and fact were submitted to the court for decision without a jury.

The incident, which is the subject of this action, occurred on April 18, 1962, on board defendant's towboat, the "John J. Rowe," on the Ohio River near Cincinnati, Ohio. Plaintiff was employed by the defendant as a "striker" or "oiler," on the towboat. After oiling a part of the port engine, plaintiff was in the process of ascending to the main deck.

In doing so, he grasped a guard railing, as was the normal custom and practice, to pull himself up onto the main deck. Instead of being welded securely, the forward end of the railing was tied to an upright post with soft bailing wire. The railing broke and plaintiff fell backward and downward, striking his head a severe blow against the port engine. A judgment is allowed against the defendant shipowner, based upon a finding that defendant was negligent in knowingly maintaining the guard rail in this condition, and that this defective railing created an unseaworthy condition, and that such unseaworthy condition and negligence were the proximate causes of the accident and the resulting injuries.

## FINDINGS OF FACT

1. Norman R. Scarberry, plaintiff, is a citizen and resident of West Virginia, residing at Point Pleasant, West Virginia, and was 42 years of age at the time of the accident. Defendant, The Ohio River Company, is a West Virginia corporation, having its principal office and place of business in Cincinnati, Ohio.

2. On April 18, 1962, the date of the accident, plaintiff was employed as a striker or oiler aboard the towboat "John J. Rowe," owned and operated by defendant. He had been employed by defendant for about 6 years prior to the accident, and defendant had found him to be a steady and reliable worker. His duties on the "John J. Rowe" were to take care of the engines; do the oiling; do the greasing; and to assist the engineer at any time. These duties of a striker or oiler were routine and were generally done without specific instructions from the engineer on duty. Plaintiff had been on duty on this towboat for about 7 to 10 days prior to the date of accident. He was a licensed engineer, holding a license issued by the United States Coast Guard.

3. On the date of the accident, plaintiff's tour of duty was from midnight to 6:00 A.M., and his immediate superior, Ivan Patton, was with him in the engine room. In the course of his employment, and immediately prior to the accident, plaintiff had been oiling the "fuel racks" on the port engine of the three engines on the towboat. He had on prior occasions oiled the "fuel racks" on the engines, and, at the time of the accident, the fact that he was oiling the "fuel racks" was known to his immediate superior, Patton, who was present and saw what he was doing. Patton testified that he saw plaintiff take an oil can and go over to grease the "fuel racks" of the engine, that he saw what he was doing, and let him go on with his duties. In order for him to perform this work on the port engine, it was necessary for him to step down approximately 28 inches from the main deck to a catwalk which ran along the starboard side of the port engine. Those oiling or working on the port engine stood on this catwalk. Attached to the main deck was a railing consisting of two horizontal bars, attached to vertical stanchions or upright posts, which ran around the engine. On the starboard side of the port engine, the handrailing was in two sections with an opening in the middle of the handrail to permit ingress and egress to the catwalk. The forward section of this particular handrail was constructed by welding a top handrail onto two upright stanchions approximately 5 feet apart. At the time of the accident, and for at least 20 days prior to the accident, the top handrail was welded to the top of the stanchion at the opening, but the stanchion and top horizontal bar were held together at the other end of the horizontal bar at the forward stanchion by "bailing wire," which was wrapped around the forward stanchion and then wrapped around the top bar to hold the two together. Plaintiff's superior, Patton, the only other employee on this particular nightwatch with plaintiff, testified that the rail was "held by a wire. It had been welded." The wire holding the two parts together was about three times the diameter of a paper clip, and was a soft metal, easily bent, the type of wire obtained from bails of rags used on the "John J. Rowe." This condition had existed for at least

20 days prior to the accident. Plaintiff became aware of the existence of the wire around the handrailing shortly after he came aboard 7–10 days prior to the accident.

4. When the vessel was under way, there was considerable vibration in the engine room at all times, to such an extent that tools could not be left on a bench or they would vibrate off. When members of the crew arose from the catwalk to the main deck, it was customary and necessary to grasp one of the stanchions or one of the horizontal bars in the area of the opening and pull themselves up from the catwalk on to the main deck, a distance of about 28 inches, as there was no step between the main deck and the catwalk so that they could step up. The sole means of ingress to and egress from the catwalk was through the opening provided for that purpose. Plaintiff was in the act of attempting to arise from the catwalk to the main deck, after finishing his work of oiling, when the accident occurred. He had turned around with his back to the engine, facing the opening in the handrail, when he grasped the top of the handrail with his left hand, while in his right hand he held his oil can, which he had been using in his work. While grasping the handrail, he placed his right foot on the main deck and by exerting a pulling motion with his left arm, started to pull his weight from the catwalk to the main deck. When he was almost up to the main deck, the railing which he was using as a support gave way and he fell backwards, his head striking the forward part of the port engine, and rendering him unconscious. The railing broke loose from the stanchions at both ends. The weld at the opening in the center parted and the wrapped "bailing wire" on the forward end of the handrail parted or unraveled in such a way as to permit the rail to come loose at that end. Patton, who was only a few feet away, found plaintiff lying on his right side on the catwalk with a piece of handrail under his left arm. The handrail parted from the stanchions because it was not suffi-
ciently attached to the forward stanchion. This, connected with the use being made of the handrail, caused the weld on the aft end to part, completely disengaging the handrail from the stanchions, thereby causing plaintiff's injuries. The fact that the forward section of this handrail was held to the stanchion by means of bailing wire was known by defendant. The handrail was defective and was not reasonably safe and adequate for its intended use as a handrail.

5. Defendant was negligent in failing to use reasonable care to supply the plaintiff with a safe place to work, to make prompt, necessary, and proper repairs to a known defective condition, and in generally failing to use reasonable care to protect the health, safety and welfare of its employees.

6. Defendant's vessel, "John J. Rowe," was unseaworthy by reason of failing to provide the seamen a reasonably safe place to work, and by reason of said vessel having defective equipment and appliances thereon for use of the seamen. Plaintiff was not guilty of contributory negligence. His duties required him to work in and about the port engine and it was necessary and proper for him to use the handrail. He was not negligent in failing to report a condition already known to the defendant, and which had existed for more than 20 days.

7. Plaintiff was unconscious for about five minutes after the accident. He was given assistance by other members of the crew, taken ashore on another boat and then taken by cab to St. Mary's and Jewish Hospitals in Cincinnati, and the following morning was taken to the office of Dr. Lewis Brown in Gallipolis, Ohio, who examined plaintiff. Thereafter he was examined by many doctors, including psychologists, psychiatrists, neurosurgeons, and general practitioners, and nearly every conceivable test was given him, primarily, to determine if there was organic brain damage resulting from the accident. It would be an endless task to detail the results of these examinations and tests. Suffice it to say that

the opinions of the medical experts are in conflict. After hearing the various witnesses, observing their demeanor, and weighing their evidence in connection with known facts, the court is of opinion, and so finds, that plaintiff has failed to prove any organic brain damage or permanent injury. Plaintiff's loss of memory and his present physical condition are not caused from organic brain damage. However, he was severely injured in other respects.

8. Plaintiff has a long history of many years duration of an anxiety complex. However, this pre-existing functional condition did not incapacitate him, and would not have disabled him except for his injury on April 18, 1962. This injury aggravated the pre-existing anxiety or functional condition to such an extent that plaintiff has much pain and suffering and loss of ability to enjoy life, and has been wholly disabled from performing work as a striker or oiler, all because of his injury on April 18, 1962. As the result of the accident, he has a definite loss of memory, and suffers from an anxiety reaction that makes him depressed. His loss of memory is such that he could not be depended upon to follow instructions in his work. He must have further psychiatric treatment to help him get reoriented. Provision for this additional treatment was taken into account in fixing the amount of settlement for maintenance and cure.

9. He has suffered and still suffers from severe headaches, fatigue and poor tolerance for exertion. Defendant's own doctors seem to admit that the injury has added an additional thrust to an already existing anxiety condition. The evidence is conflicting as to how much longer this disabling condition will continue, but the more credible evidence indicates that plaintiff is improving and should reach his normal state, and be able to resume employment as a striker or oiler in about one year from the date of trial, or about November, 1963. At the date of trial he was not able to engage in work on a vessel, either as a striker or an ordinary deck hand. In making these findings and assessing damages, the court has taken into consideration plaintiff's demeanor and general intellectual functioning at the trial.

10. There is no basis in fact for defendant's contention that plaintiff's disability is due, in whole or in part, to worry about loss or abolition of his job, his financial condition, or his son's educational problems.

11. It is true that plaintiff in prior years had headaches, was punished for bad conduct while in the Navy, had trouble with prior employers, and his intelligence tests were not high. However, he has been a steady and satisfactory employee for defendant for more than 6 years, and his prior experiences did not disable him in any way.

12. From the date of injury to the date of trial, plaintiff had been totally incapacitated for work by virtue of such injury. The trial commenced on October 30, 1962, and was completed on November 2, 1962, at which time plaintiff had lost slightly more than 6 months work, which constituted an out-of-pocket loss of $2400.00, which is ½ of his earnings from defendant in 1961.

Plaintiff will not be able to work for a considerable period after the date of trial. The evidence on this point is very conflicting, and no one is able to predict exactly when he will be able to go to work.

13. Plaintiff has suffered the following damages, which the court finds to be fair and reasonable, all of which proximately resulted from negligence of defendant and the unseaworthiness of the vessel:

(a) Pain, suffering and inconvenience, both past and future     $ 5,000.00
(b) Loss of earnings to time of trial     $ 2,400.00
(c) Impairment of future earning capacity from date of trial     $ 7,200.00

Total     $14,600.00

14. Since the action for maintenance and cure has been settled, the court will not allow a duplication of recovery. The settlement in the maintenance and cure action was in the amount of $4,070.00, of which approximately $3,000.00 was for maintenance. In the remaining action no claim has been made for any medical expense, past or future, and accordingly the amount of the award of $14,600.00 should be reduced by $3,000.00, leaving a balance due plaintiff of $11,600.00, for which judgment may be entered.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action under its general Admiralty and Maritime jurisdiction, as well as under the Jones Act.

2. On April 18, 1962, defendant was a common carrier on navigable waters, and owed to plaintiff such duties of care as is required by Admiralty Law and as required under the Jones Act.

3. Plaintiff has sustained his burden of proving, by a fair preponderance of the credible evidence, that his injuries were the proximate result of the defendant's breach of warranty of seaworthiness, and of defendant's negligence, as set forth above.

4. Plaintiff was injured on April 18, 1962, as a result of the negligence of the defendant and as a result of the unseaworthy condition of the "John J. Rowe," a vessel owned, operated and controlled by defendant.

5. Under general Maritime and Admiralty Law, as well as under the Jones Act, plaintiff is entitled to recover damages for pain, suffering and inconvenience, loss of wages and future impairment of earning capacity.

6. The handrail which broke in plaintiff's hand was an "appliance pertinent to the ship," and it was unseaworthy in the sense that it was inadequate for the purpose for which it was ordinarily used because of the manner in which it was held to the stanchion by "bailing wire" at the forward end of the handrail.

7. Defendant is liable in damages to plaintiff, both on the theory of negligence under the Jones Act and, particularily on the theory of unseaworthiness under General Maritime and Admiralty Law.

8. Defendant is liable only for the aggravation of the pre-existing functional condition, and is not liable for the pre-existing condition itself. The court has only allowed damages for the increased and augmented suffering and disability which was the proximate result of defendant's act.

9. Plaintiff did not assume the risk of the unseaworthiness of the vessel.

10. There was no duty upon the part of the plaintiff to notify his superior officers concerning the presence of the bailing wire, a fact which they admittedly knew.

Counsel for plaintiff may prepare and present an appropriate order, after giving defense counsel an opportunity of inspection and approval as to form.