**Ed WEASON, Appellant,**

v.

**Dave HARVILLE, Appellee.**

**No. S–280.**

Supreme Court of Alaska.

Sept. 20, 1985.

Gerald W. Markham, Kodiak, for appellant.

Diane L. Daley and Michael A. Barcott, Faulkner, Banfield, Doogan & Holmes, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

Ed Weason was hired as a crew member on the M/V Margaret Lynn by Dave Harville, Sr. in the summer of 1981. At that time, Weason was hired for the duration of the shrimp season, but the possibility of his working for Harville during the crab season was explicitly left open. On August 31, 1981, Weason injured his left ring finger when he slammed it in a bulkhead door on the Margaret Lynn. It is undisputed that Weason was acting in the vessel's service when the injury occurred. As a result of his injury, Weason was unable to work as a crewman through November 7, 1981, missing the last shrimp trip of the season as well as all of the crab season until that time.

Some time after his injury, probably in mid- to late-September, 1981, Weason went to Harville and demanded the name of Harville's insurer and that Harville pay his medical bills. There is conflicting evidence as to Harville's response. Harville claims that, after speaking to one of his attorney partners, he offered to pay Weason's medi-

cal bills. Weason's version is that Harville did speak to his attorney partner, but only offered to pay half of his medical bills if Weason did not have surgery on his finger. The trial court found:

> Defendant did offer to pay half of his [Weason's] medical bills. At no time during this conversation or thereafter did defendant ever personally attempt to communicate to plaintiff that he would pay his full medical bills, his maintenance or his wages, even to the end of the shrimp season.

Weason then retained an attorney and filed suit on October 8, 1981. No action was taken by Harville, nor any payments made until early December, 1981, when Harville's insurance carrier paid Weason $1,625 in back maintenance. On February 1, 1982, Weason was paid an additional $537.23 in lost wages. This was the amount which Weason would have earned had he been able to participate in the fourth and final trip of the shrimp season. No amounts were ever tendered for earnings during the king crab season.

Trial was held before Superior Court Judge Madsen without a jury on August 17, 1982. Weason claimed at trial that he was entitled to his medical expenses, earnings during the shrimp and king crab seasons, additional maintenance, attorney's fees, and punitive damages. Judge Madsen awarded Weason $1,231.80 for his medical expenses, maintenance, and back shrimp season wages. Judge Madsen also awarded Weason prejudgment interest accruing at the rate of 1.5% per month beginning sixty days after his maintenance and cure was due and payable. Finally, Weason was awarded $481 in attorney's fees. Judge Madsen refused to award Weason

lost wages for the king crab season, because he found that Weason did not meet his burden of proving that he had an employment contract with Harville during the king crab season. Judge Madsen also refused to award Weason punitive damages in spite of his finding that Harville acted in bad faith by not paying Weason his maintenance, cure, and back wages within sixty days of when they became due.

On appeal, Weason's primary contention is that he was employed as a crew member on the Margaret Lynn during the king crab season, and therefore was entitled to an additional $8,713.48, which is what he would have earned as a full-share crew member during the crab season until November 7, 1981. He also claims that he should have been awarded punitive damages and his actual attorney's fees.

### I.

■ This is an admiralty action, and federal admiralty law rather than state law applies even though it is brought in Alaska state courts. *Shannon v. City of Anchorage,* 478 P.2d 815, 818 (Alaska 1970); G. Gilmore & C. Black, *The Law of Admiralty* § 6–58 (2d ed. 1975).

■ Maintenance and cure is an ancient [1] maritime remedy for seamen who are injured while serving the vessel for which they work. The remedy is absolute and the seaman is entitled to his wages, maintenance, and cure without regard to his fault.[2] *See* 2 M. Norris, *supra* n. 1 § 551 at 31. Thus, comparative fault will not reduce the seaman's award.

■ The damages recoverable are: (1) maintenance (defined as the cost of room and board comparable to that which the

---

1. 2 M. Norris, *The Law of Seamen* § 540 (3d ed. 1970) contains a compilation of Middle Ages sea codes which grant seamen various rights resembling modern day maintenance and cure.

2. The exception to this is where the seaman willfully misbehaves, and this brings about his injuries. Examples of injuries not covered by this remedy are venereal disease and injuries resulting from intoxication. Even this exception is narrowly construed in favor of the sea-

man. *See* 2 Norris, *supra* n. 1 §§ 602, 603; Gilmore & Black, *supra* § 6–8. Gilmore and Black point to one case where "maintenance and cure was awarded to a seaman who had suffered a broken leg in jumping from a window of a Yugoslavian brothel following a dispute over financial arrangements." *Id.* at 291, *citing Koistinen v. American Export Lines,* 194 Misc. 942, 83 N.Y.S.2d 297 (N.Y.City Ct.1948).

seaman received while on board the vessel); (2) cure (for the present purposes, defined as medical expenses until the maximum possible cure has been attained); and (3) wages which the seaman would have earned until the end of the voyage. Generally, the plaintiff (seaman) bears the burden of proving each element of the maintenance and cure cause of action. This is not a heavy burden:

> [H]e [the seaman] need only show (a) his engagement as a seaman, (b) his illness or injury, that it occurred, was aggravated or manifested itself while in the ship's service, (c) *the wages to which he may be entitled to the end of the voyage,* and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging, etc.

2 Norris, *supra* n. 1 § 558 (footnotes omitted) (emphasis added); *see Coughenour v. Campbell Barge Line,* 388 F.Supp. 501, 504 (W.D.Pa.1974); *George v. The Chesapeake & Ohio Railway,* 348 F.Supp. 283, 286 (E.D.Va.1972). The third element is the only one at issue here. Specifically, what was the end of Weason's voyage—the end of the shrimp season or the end of the crab season?

In many maritime contracts, the duration of the voyage is easy to prove since the seaman signs articles which detail the voyage's length. 1 Norris, *supra* n. 1 § 113. In the present situation, Weason did not sign articles but had an oral contract with Harville. Both Weason and Harville agree that at the outset Weason was hired only for the shrimp season. Weason claims, however, that he had an oral understanding with Don Johnson, the crab season skipper of the Margaret Lynn, which modified his original agreement. According to Weason, this modification was that he would be hired as a crew member of the Margaret Lynn during the crab season.

The superior court found that Weason did not present enough evidence to establish a crab season contract:

> [T]he evidence is clear that even if Don Johnson may have indicated to plaintiff that he would be hired on for crab [sea-

son], their discussions never materialized beyond that; there was no share discussion, no real negotiation, therefore, the plaintiff failed in his burden of proof in establishing formation of a new contract for crab. For the court to find such a contract would amount to the court writing a contract which the parties never negotiated, this the court refuses to do.

When the trial court makes a finding of fact, we will not overturn it unless it is clearly erroneous. Alaska R.Civ.P. 52(a). Our review of the record in this case reveals only four items of evidence on this issue. First, Weason testified that Don Johnson told him that he and Harville had agreed that Weason would have a job for the crab season. By Weason's own testimony, the terms of this offer were left open, as Johnson did not know what percentage of receipts would be allocated among the crew. Don Johnson did not testify at trial. Second, Harville testified that he and Johnson had agreed that Weason definitely would not be hired for the king crab season. Third, Weason testified that he and Johnson on one occasion inspected and inventoried the Margaret Lynn's crab gear prior to the crab season. Finally, Harville testified that he could veto any crew member selection made by Johnson. This fact, combined with the fact that Harville considered Weason to be an inept worker makes the existence of an agreement for the king crab season less likely.

This evidence is at best inconclusive, and certainly does not compel a finding that there was a crab season agreement. As such, the superior court's finding that Weason was employed only for the shrimp season will be upheld.

## II.

Weason contends that the superior court also erred because it did not award him punitive damages for Harville's failure to pay maintenance and cure within a reasonable time after it became due.

Whether punitive damages may be awarded for a vessel owner's failure to pay maintenance and cure is unclear. This con-

fusion stems from *Vaughan v. Atkinson,* 369 U.S. 527, 530–31, 82 S.Ct. 997, 999–1000, 8 L.Ed.2d 88, 91–92 (1962), where the Supreme Court reversed a holding that a seaman is not entitled to an award of attorney's fees because of the shipowner's refusal to pay maintenance and cure which was clearly owed. The Court held that in appropriate cases, lower courts, pursuant to their equity powers, should award attorney's fees. The majority indicated that the attorney's fees would be compensatory in nature. *Id.* The dissent, however, disagreed, stating that an award of attorney's fees could only be punitive, not compensatory:

> [I]f the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman, the latter would be entitled to exemplary damages in accord with traditional concepts of the law of damages.... While the amount so awarded would be in the discretion of the fact finder, and would not necessarily be measured by the amount of counsel fees, indirect compensation for such expenditures might thus be made.

369 U.S. at 540, 82 S.Ct. at 1004, 8 L.Ed.2d at 97 (Justice Stewart, dissenting) (citation omitted).

The ambiguity of *Vaughan* has subsequently generated a split among the circuits on this issue. The Second Circuit has refused to allow punitive damages for failure to pay maintenance and cure. *Kraljic v. Berman Enterprises, Inc.,* 575 F.2d 412, 416 (2nd Cir.1978). Its reasoning was that the Supreme Court in *Vaughan* limited the remedy for such conduct to attorney's fees. The First and Fifth Circuits, on the other hand, have allowed punitive damage awards for wrongful failure to pay maintenance and cure. *Holmes v. J. Ray McDermott & Co.,* 734 F.2d 1110, 1118 (5th Cir. 1984); *Robinson v. Pocahontas, Inc.,* 477 F.2d 1048, 1051 (1st Cir.1973). The Ninth Circuit has expressly left this question unresolved. *Kopczynski v. The Jacqueline,* 742 F.2d 555, 560 (9th Cir.1984).

We think that the First and Fifth Circuits take the correct approach and we hold that punitive damages may be awarded in cases where the shipowner in bad faith refuses to pay maintenance and cure to a seaman where it is clearly owed. When a shipowner refuses to pay maintenance and cure the seaman's only alternative is a lawsuit, which is a lengthy and expensive process. During this time, the seaman may have no funds to effect his recovery, and thus may be forced to work when he should be resting. *Cf. Vaughan v. Atkinson,* 369 U.S. at 533, 82 S.Ct. at 1001, 8 L.Ed.2d at 93. In addition, the shipowner might use a refusal to pay maintenance as a bargaining tool, forcing an impoverished seaman to accept a low amount or face a lengthy court battle. *Cf. Harper v. Zapata Off-Shore Co.,* 741 F.2d 87, 90 (5th Cir.1984). Thus, the availability of punitive damages will act as a deterrent to the unscrupulous employer, and will result in more speedy resolution of maintenance and cure claims.

The type of conduct that would justify an award of punitive damages was first described by Justice Stewart in his dissent in *Vaughan.* In his view, punitive damages may be awarded where "the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman." 369 U.S. at 540, 82 S.Ct. at 1004, 8 L.Ed.2d at 97. More recently, the Fifth Circuit summarized the types of conduct which have been held to warrant punishment:

> Conduct that gives rise to damages for the termination of maintenance and cure has been characterized as "callous and recalcitrant," ... "arbitrary and capricious," ... and "willful, callous, and persistent." ... Laxness in investigating a claim that would have been found to have merit has been found to meet the standard, ... as has a finding that the employer had "no reasonable excuse" for its refusal....

*Holmes v. J. Ray McDermott & Co.,* 734 F.2d at 1118 (citations omitted).

Harville claims that his conduct was not of such a character as to require punishment. Whether it was is a question for the trial court. We remand to the superior court for a determination on this issue.[3]

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED for proceedings consistent with this opinion.

**3.** Weason also claimed on appeal that the award of $481 attorney's fees was inadequate. We find that this award is not unreasonable in light of the superior court's judgment. However, if punitive damages are awarded the court may adjust the award of attorney's fees.