Julio BRASSEA, Appellant,

v.

Ward E. PERSON, Appellee.

No. S–8371.

Supreme Court of Alaska.

Aug. 13, 1999.

Matthew W. Claman, Anchorage, for Appellant.

Donald K. McLean, James W. Talbot, Bauer, Moynihan & Johnson, Seattle, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

*OPINION*

MATTHEWS, Chief Justice.

I.  *INTRODUCTION*

Seaman Julio Brassea suffered an inguinal hernia while working as a fisherman on the F/V DAPHNE S. While performing surgery to repair this hernia, the doctor discovered a second, unrelated Richter's hernia and performed a second surgery to repair it.  The owner of the DAPHNE S. paid maintenance and cure for the costs associated with the first hernia, but not the second, contending that Brassea was no longer "in the service of

the ship" when the second hernia was discovered. The superior court ruled that maintenance and cure was not owed Brassea because he was not "in service of the vessel" at the time the second hernia manifested itself and that there was no causal connection between Brassea's service to the vessel and his Richter's hernia.

Because Brassea was in the service of the vessel at the time his injury manifested itself, and because the issue of causation is irrelevant to maintenance and cure analysis, we reverse.

## II. FACTS AND PROCEEDINGS

### A. Facts

Julio Brassea was employed to work as a fisherman aboard the F/V DAPHNE S. by the vessel's owner, Ward Person. Brassea's term of employment was to be for the duration of the 1995 Kodiak salmon season, beginning in early June 1995. The vessel ceased fishing for the season on August 11, 1995. But on July 19, 1995, Brassea injured himself while lifting a twelve-gallon gas tank. On July 24 he reported the injury to Person, who encouraged him to seek medical treatment, and on July 25 he was diagnosed with a right inguinal hernia.[1] Person paid Brassea thirty days maintenance (at $25 per day for a total of $750) and hired a replacement.

Brassea underwent laparoscopic surgery for the inguinal hernia on July 27, 1995. During the surgery Dr. Foody, the treating physician, noticed that Brassea also had what appeared to be a previously undiagnosed Richter's hernia,[2] caused by surgery Brassea had undergone as an infant approximately fifty years earlier. Believing the Richter's hernia to be a potentially life-threatening condition, Dr. Foody determined it was medically necessary to repair it at that time. Dr. Foody's attempt to repair the Richter's hernia laparoscopically was unsuccessful, so he closed the laparoscopic incisions and performed a separate, external surgery.

Both surgeries were successful, and Brassea was discharged from the hospital on July 31, 1995. At the follow-up appointment on August 3, however, Brassea complained of pain from the incision made to repair the Richter's hernia, and he was readmitted with a diagnosis of a fistula[3] in the wound from the Richter's incision. He remained in the hospital until August 19, 1995, and was unable to return to work until September 22, 1995. If not for the Richter's hernia surgery and treatment for the related fistula, Brassea would have recovered completely by August 21, 1995.

Dr. Foody testified that he was unable to segregate the costs of the two hernia repair operations, but Person hired a registered nurse to separate the billing. She determined that $11,031.27 of the bill was attributable to the inguinal hernia (comprising a portion of the July 27–31 hospital stay). Person paid this amount. She attributed the remaining costs to the Richter's hernia ($34,056.18 in medical expenses), and Person contests his responsibility for this amount. As stated above, Person has paid Brassea $750 in maintenance for the thirty-day period from July 25 to August 23. He also paid Brassea his unearned wages in the amount of $601.81 through August 11, 1995—the end of salmon fishing for the DAPHNE S. But Person did not pay maintenance for the period of August 24 through September 22, when Brassea returned to work.

### B. Procedural History

Brassea sued Person in superior court, asserting claims for negligence under the Jones Act,[4] and for unseaworthiness, maintenance, cure and wages under general mari-

---

1. An inguinal hernia occurs when, during physical exertion, a section of intestine is forced through the small sac in the muscle wall of the abdomen left by the descent of the testicle early in development.

2. A Richter's hernia consists of an obstruction of the small intestine, caused by the intestine becoming embedded in, or scarred to, the abdominal wall.

3. A fistula is "an abnormal passage leading from an abscess or hollow organ to the body surface or from one hollow organ to another and permitting passage of fluids or secretions." Webster's New Collegiate Dictionary 467 (9th ed.1989).

4. 46 U.S.C. § 688 (1994).

time law. Both parties moved for summary judgment on the maintenance, cure and wages claim. The superior court granted Person's motion and denied Brassea's in a Memorandum Order dated July 29, 1997. The parties subsequently stipulated to dismissal of the remaining claims, and the court entered final judgment on October 6, 1997. Brassea appeals the grant of summary judgment in favor of Person.

## III. STANDARD OF REVIEW

"State courts may apply their own standard of review to maritime cases under the 'saving to suitors' clause [of 46 U.S.C. § 1333]."[5] We review de novo appeals from grants of summary judgment involving questions of law.[6] We will adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[7]

## IV. DISCUSSION

### A. The Right of Maintenance and Cure

" 'Maintenance' is the right of a seaman to food and lodging if he falls ill or becomes injured while in the service of the ship. 'Cure' is the right to necessary medical services. Both extend to the point of 'maximum recovery'."[8]

The right to maintenance and cure arises from the contractual nature of the employer-employee relationship, and is in some respects more comprehensive than the right to worker's compensation.[9] Both are liability-without-fault systems, but maintenance and cure contains no causation element and is not the seaman's only remedy.[10]

The origin of the seaman's right to maintenance and cure in the United States rests on two policy grounds. First is the general social interest in protecting sailors. The second policy ground is national: the security of the United States and its economic well-being depend on an able marine fleet. "[Maintenance and cure] encourages seamen to engage in perilous voyages with more promptitude, and at lower wages. It diminishes the temptation to plunder upon the approach of sickness; and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw."[11]

The importance of these dual policy objectives has led courts to construe the right to maintenance and cure broadly. In *Farrell v. United States*,[12] the Supreme Court noted:

It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigations. The seaman could forfeit the right only by conduct, whose wrongful quality even simple men of the calling would recognize—insubordination, disobedience to orders, and gross misconduct. On the other hand, the Master knew he must maintain and care for even the erring and careless seaman, much as a parent would a child. For any purpose to introduce a graduation of rights and duties based on some relative proximity of the activity at time of injury to the "employment" or the "service of the ship" would alter the basis and be out of harmony with the spirit and function of the doctrine and would open the door to the litigiousness which has made the landman's remedy so often a promise to the ear to be

5. *Brown v. State*, 816 P.2d 1368, 1371 n. 2 (Alaska 1991).

6. *See id.*

7. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

8. 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, 348 (2d ed.1994) (citations omitted).

9. Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty*, 281–82 (2d ed.1975).

10. *See id.*

11. *Id.; see also Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) (noting that maintenance and cure is designed to achieve "the combined object of encouraging marine commerce and assuring the well-being of seamen").

12. *Farrell v. United States*, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949).

broken to the hope.[13]

### 1. *Causation is irrelevant in maintenance and cure analysis.*

The superior court addressed the issue of causation in its Memorandum Order, reasoning that "[i]n the case of a pre-existing condition, a ship's master is liable only for aggravation of the condition, not for the condition itself." The two cases the superior court cited for this proposition [14] are inapposite, however, as they concern claims brought for negligence under the Jones Act (where causation is an element), not claims for maintenance and cure. In fact, the question of maintenance and cure was explicitly avoided in both cases; in one it was expressly reserved for a separate judgment,[15] and in the other the parties had settled the issue during the trial.[16]

As suggested by the language of *Farrell, supra,* requiring a showing of causation for maintenance and cure claims misapplies the law. "The duty to provide maintenance and cure is without regard to fault, and negligence and causation are not relevant." [17] "The seaman may recover for any injury or illness suffered without his misconduct during the employment period. The injury or illness need not result from or be in any way causally related to his shipboard duties." [18]

■ This rule can be traced to *Calmar Steamship Corp. v. Taylor.*[19] There, during an examination for a stubbed toe a seaman was discovered to be suffering from Buerger's disease.[20] The Court held the seaman entitled to maintenance and cure, even though the disease was unrelated to his foot injury.[21] *Calmar* therefore establishes that maintenance and cure extends to all injuries and illnesses which are "aggravated *or manifested* " during the seaman's term "in service of the ship."

### 2. *Elements of a maintenance and cure claim*

■ Although the seaman has the burden of proof in a case for maintenance and cure, the burden itself is light. The claimant must show only four elements: (1) his engagement as a seaman; (2) that his illness or injury was aggravated or manifested itself while in the ship's service; (3) the wages to which he is entitled at the end of the voyage; and (4) the expenditures or liability he incurred for medicines, lodging, etc.[22]

In this case, the only contested element is (2)—whether Brassea's Richter's hernia "manifested itself" while he was "in the service of the ship."

### B. *At the Time He Underwent Surgery for His Inguinal Hernia, Brassea Was "In the Service of the Ship" for Purposes of Maintenance and Cure.*

■ Brassea contends that he was in the service of the ship at least until August 11, 1995 (when the DAPHNE S. stopped fishing for salmon), and arguably until September 22, 1995 (when Brassea reached maximum cure). Person responds that Brassea's service to the ship ended when his inguinal hernia rendered him unable to return to work aboard the DAPHNE S. Although Person paid maintenance and cure after that point, he claims Brassea was no longer in the service of the ship.

■ In *Farrell,* the Supreme Court defined "in the service of the ship" as the state of being "generally answerable to [the] call to

13. *Id.* at 516, 69 S.Ct. 707.

14. *Milos v. Sea–Land Serv., Inc.,* 478 F.Supp. 1019, 1023 (S.D.N.Y.1979); *Scarberry v. Ohio River Co.,* 217 F.Supp. 189, 193 (S.D.W.Va. 1963).

15. *Milos,* 478 F.Supp. at 1029.

16. *Scarberry,* 217 F.Supp. at 189, 193.

17. *Schoenbaum, supra* note 8, at 349 (footnote omitted).

18. *Gilmore & Black, supra* note 9, at 287–88.

19. 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938).

20. *Id.* at 526, 58 S.Ct. 651.

21. *Id.* at 529, 58 S.Ct. 651.

22. *See Weason v. Harville,* 706 P.2d 306, 309 (Alaska 1985) (quoting 2 M. Norris, *The Law of Seamen* § 558 (3d ed.1970)).

duty rather than actually in performance of routine tasks or specific orders."[23] A seaman on vacation, for example, is not "answerable to the call of duty," and therefore is not "in the service of the ship."[24]

Person argues that Brassea was not "answerable to the call of duty" at the time he underwent surgery to repair the inguinal hernia because he could not be called upon to return to the ship. He contends that Brassea's shipboard injury had rendered him unfit for work, and no possibility existed that he would be summoned for duty.

Brassea argues for a liberal interpretation of the "in the service of the ship" standard. This argument conforms to the expansive interpretation encouraged by the Supreme Court in *Aguilar v. Standard Oil Co.*[25] In that case, the Court extended "service" to include injuries sustained while on shore leave. The Court reasoned that the policy considerations supporting the broad obligation of maintenance and cure required an equally broad definition of "service."[26]

The assumption is hardly sound that the normal uses and purposes of shore leave are "exclusively personal" and have no relation to the vessel's business.... [S]hore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

... [I]t is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment.[27]

 The facts of Brassea's case are even more persuasive. Brassea was not engaged in an "exclusively personal" activity when he underwent surgery for the inguinal hernia. His injury, and subsequent surgery, were incidents of his position as a seaman and closely related to the business of the ship. The second hernia was discovered and thus manifested itself during his treatment for the inguinal hernia at a time when, except for the treatment, he would have been working aboard the DAPHNE S. We conclude, therefore, that the discovery and treatment of the second hernia occurred while Brassea was in the service of the ship.

## V. CONCLUSION

In light of the tradition of liberally interpreting a shipowner's liability for maintenance and cure, a liability that is "among 'the most pervasive' of all and ... not to be defeated by restrictive distinctions nor 'narrowly confined,'"[28] we REVERSE the superior court's judgment and hold that Brassea was in the service of the ship when his Richter's hernia was manifested, and that he is therefore entitled to maintenance and cure. We REMAND for further proceedings consistent with this opinion.

CARPENETI, Justice, not participating.

**23.** *Farrell*, 336 U.S. at 516, 69 S.Ct. 707.

**24.** *See Shaw v. Ohio River Co.*, 526 F.2d 193, 194, 198–99 (3d Cir.1975).

**25.** 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943).

**26.** *Id.* at 733, 63 S.Ct. 930.

**27.** *Id.* at 733–34, 63 S.Ct. 930.

**28.** *Vaughan v. Atkinson*, 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (quoting *Aguilar*, 318 U.S. at 735, 63 S.Ct. 930).