Carrel **SKIPPER**, Libelant,

v.

**AMERIND SHIPPING CORPORATION, N. V. Stoomv and Vinke and Company, in personam, and the S.S. HILVERSUM, her engine, tackle, furniture, etc., in rem, Respondents.**

No. 4833.

United States District Court
E. D. Louisiana,
New Orleans Division.
May 25, 1964.

254

Bass & Lawes, Joseph E. Bass, Jr., Eugene H. Lawes, Lake Charles, La., for Carrel Skipper.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert B. Acomb, Jr., John R. Peters, Jr., New Orleans, La., for Amerind Shipping Corp., N. V. Stoomvaart-Maatschappij "Oostzee" and Travelers Ins. Co.

AINSWORTH, District Judge:

Carrel Skipper has filed this libel against Amerind Shipping Corporation, N. V. Stoomv and Vinke and Company and the vessel SS HILVERSUM, for damages resulting from an injury which he sustained while working as a longshoreman aboard said vessel, while employed by Lake Charles Stevedores, Inc. Respondents filed a petition of impleader against Lake Charles Stevedores, Inc. under Admiralty Rule 56 for indemnity under the doctrine of Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), which was later voluntarily dismissed with prejudice. The Travelers Insurance Company has intervened as a party plaintiff as the compensation insurer under the Longshoremen's Act.

On July 25, 1960, libelant was engaged in loading cargo in No. 4 hold aboard the HILVERSUM. The hold had been split and the after end was being loaded while the forward section remained empty. Two tiers of cargo and part of the third were already stowed when libelant went to work. The first tier consisted of bales of cotton; the second and third tiers contained drums of resin. Each tier was separated by dunnage. Two 1-inch manila ropes of about 60 feet long were strung across the width of the vessel, as safety lines, by an employee of Lake Charles Stevedores, Inc. A short time after the men went to work Skipper was attempting to move one of the resin drums in position so that it could be stowed. He was rolling the drum from the point where it was lowered into the hatch to the men who were standing the drums upright. He grasped the lip of the drum with his cargo hook; his back was to the edge of the cargo and as he started to pull with great force, the hook slipped and he fell back about 4 feet and thence off the third tier to the deck, a distance of approximately 14 feet. As Skipper fell, he made an attempt to grasp the safety line but the line sagged, his grip slipped and he was unable to hold on to it. Libelant suffered compound fractures of the tibia and fibula. Shortly after the injury, Skipper developed osteomyelitis and at the time of the trial was limping and using a cane to assist him in his walking.

Libelant alleges that the safety lines were improperly rigged and that this defect made the vessel unseaworthy. He further contends that the cargo was stowed in violation of Coast Guard Regulations, C.F.R. 146.27–25C7, and that the dunnage floor was uneven as the result of the violation.

Libelant, a longshoreman, bears the burden of showing that the vessel was unseaworthy. Mosley v. Cia. Mar. Adra, S. A., 2 Cir., 1963, 314 F.2d 223. If he sustains this burden he is entitled to recover even though the unseaworthy condition was caused by the stevedore. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 1127 (1954).

The evidence shows that the safety lines were furnished by the vessel and tied in position by the stevedore. These safety lines are required by United States Department of Labor Safety and Health Regulations for Longshoring, 24 C.F.R. 7551, which provide: "When an edge of a hatch section or of stowed cargo more than eight feet high is so exposed that it presents a danger of persons falling the edge shall be guarded by a line, safety net or railing." The vessel is approximately 60 feet wide at the point where the lines were stretched. One line was waist high; the other line was about ankle high. The testimony of the witnesses was to the effect that the lines were not taut but considerably sagged. Everyone who saw the accident testified that when Skipper fell against the rope it sagged further and that he made an attempt to prevent his fall but was unable to grasp the line securely. Skipper testified that the rope sagged almost to the level of the dunnage and that he was unable to retain his hold on the line. The captain testified that he saw how the longshoremen had placed and tightened the lines and he felt that it was adequate.

We hold that the line was not properly placed and not made sufficiently taut. Respondents contend that the line complied with the regulation in that the line itself was in no way defective. But the rope should have been made taut and also placed back from the edge of the cargo in order to afford protection from the hazard of falling over this high ledge. The negligent placement and stretching of the safety line created a dangerous condition aboard the vessel. The line belonged to the vessel and was attached thereto and thus the defect was in the ship's hull, gear, stowage and appurtenant appliances and equipment, thereby rendering it unseaworthy. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). The failure of a longshoreman to properly use seaworthy equipment may result in an unseaworthy condition for which recovery can be had by another longshoreman. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Grillea v. United States, 2 Cir., 1956, 232 F.2d 919; Mollica v. Compania Sud-Americana De Vapores, 2 Cir., 1953, 202 F.2d 25, cert. denied 345 U.S. 965, 73 S.Ct. 952, 97 L.Ed. 1384 (1953). A shipowner is liable for an unseaworthy condition whether he is aware of it or not and even though he has no opportunity to correct it. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

We next consider respondents' contention that it was libelant's own negligence which caused his injury. It is true that libelant's failure to make sure that his cargo hook did not slip was a substantial factor in causing his injury. The combination of the hook slipping and the misplaced and sagging safety line were the causes of the accident. Both were substantial factors. We find libelant's negligence to be 50 per cent of the cause of the accident.

Skipper suffered compound fractures of the tibia and fibula of the left leg and required three operations. The first operation was for the purpose of repairing the fracture. The second and third operations were to arrest and cure osteomyelitis which developed. Libelant's leg was in a cast for eight months and he has not yet regained full use of it. On the

day of the trial he walked with a decided limp and used a cane to assist him. The medical testimony showed that Skipper would not be able to perform strenuous manual labor. One doctor stated that Skipper has a 25 per cent disability but that he should be able to perform some type of manual labor. Skipper will have to be cautious in whatever he does lest he injure the leg and activate the ostemyelitis. His earnings prior to the accident averaged about $2,000 annually. More than $4,000 was expended on medical expenses.

Intervenor Travelers Insurance Company paid a total of $8,036.88 to Skipper under the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C.A. § 901 et seq.) and is entitled to recover this amount from the award in behalf of Skipper. 33 U.S.C.A. § 933. A proper award to libelant, reduced by the contributory negligence we have found, is the sum of $25,000, and as further reduced by intervenor's compensation claim, is the net sum of $16,963.12.

Judgment will be entered accordingly.