Mae Eleanor **SWEENEY, Administratrix of the Estate of Lawrence Robert Sweeney, Deceased, Plaintiff-Appellee,**

v.

**AMERICAN STEAMSHIP COMPANY, Defendant-Appellant.**

No. 73–1236.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1973.

Decided Feb. 5, 1974.

William S. Busch, New York City, for defendant-appellant; Cadwalader, Wickersham & Taft, New York City, Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, on brief; (John A. Sullivan, New York City, Arnold F. Bunge, Jr., Toledo, Ohio, of counsel).

Merritt W. Green, II, Green & Lackey, Toledo, Ohio, for plaintiff-appellee.

Before 'EDWARDS and PECK, Circuit Judges, and CECIL, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

The American Steamship Company, defendant-appellant, perfected an appeal in this admiralty case from a judgment entered against it in the amount of $83,-209.22 for the death of an employee seaman. The basic facts are not in dispute.

Appellant owns and operates the U.S. Gypsum, a Great Lakes steamer, which in 1970 operated out of the Port of Toledo, Ohio. Lawrence R. Sweeney, plaintiff-appellee's decedent, an experienced seaman and licensed engineer, was employed as Third Assistant Engineer on the Gypsum during the 1970 season. When the Gypsum returned to Toledo for the customary winter lay-up, decedent stayed aboard as part of the "after-end" crew which performed the bulk of the lay-up work. In order to lay-up the Gypsum, she was moored alongside the steamer Peter Reiss, which in turn was moored to a dock in the Toledo Harbor.

The lay-up process for Great Lakes vessels is nearly always the same. The work is done by members of the ship's regular crew who, if they have worked an entire season, receive a substantial bonus for this duty. The purpose of the lay-up is to prepare the ship for the severe winter experienced on the lakes, where the presence of ice prevents year-round operations. The process takes from four to six weeks to complete.

The "forward-end" or deck crew secures the forward end of the vessel and provides a means of access from ship to shore. In this case, since the Gypsum was tied side by side another vessel, the deck crew had to construct a gangway to bridge the gap between the two vessels. In order to do this it was necessary to lower a section of the Gypsum's steel cable railing. Several stanchions were removed to slack the steel cables, the gangway was placed in the space, and a single length of hemp rope was strung loosely from the nearest standing stanchion to the wooden railings on the gangway to replace the three separate steel cables that made up the normal railing. This task completed, the deck crew departed for the season and the after-end crew continued working on the Gypsum's machinery.

On December 26, 1970, decedent was scheduled to report for work at 8:00 o'clock a. m. At 9:00 a. m. he appeared in the engine room but was unsteady on his feet and uncoordinated in his movements. The Chief Engineer did not think decedent was able to work and suggested a coffee break. At about 10:00 a. m. the Chief went to decedent's room and found him asleep in his bunk. Between 1:00 and 1:30 p. m. the Chief again went to the decedent's room and this time found him sitting at his desk with his head on his arms. He warned him to shape up or go see a doctor. Although the Chief thought decedent was drunk, he detected no odor of alcohol about his person at any time that day, and no liquor bottles were seen.

At approximately 2:00 p. m. the Second Engineer passed decedent's room and decedent called him in. He was still seated at his desk with his head on his arms. A bottle of medicine was on the desk, but there was no sign of alcoholic beverages in the room. During a short conversation which followed, decedent indicated to the Second Engineer that he was going to see a doctor because he felt ill. The Second Engineer was the last person to see decedent alive.

There was evidence that decedent had been feeling ill for some time prior to the lay-up period, and that he had visited the emergency room of a local hospital

complaining of upper abdominal distress as recently as December 20th. At that time his problem had been diagnosed as a stomach disorder and medicine containing atrophine and barbiturates had been prescribed.

Decedent had arranged to meet his wife at a local restaurant at 4:30 p. m. on the afternoon of December 26th. He did not appear at the appointed time, and his wife became somewhat concerned since he rarely was late. After waiting at the rendezvous for some time she left and went to the Gypsum to find him. Nobody aboard the ship knew of his whereabouts. Failing in her efforts to locate decedent, she notified the police that he was missing and returned to her home. The next morning, December 27, 1970, the First Engineer discovered decedent's body wedged between the sides of the Gypsum and the Peter Reiss in a slightly head downward position near the point where the gangway connected the two ships.

An autopsy revealed that the cause of death was congestive heart failure brought on by prolonged suspension in an inverted position. Time of death was fixed at 6:00 p. m. on the 26th of December, and both the Deputy Coroner and the pathologist agreed that it took approximately two hours for death to ensue after decedent became wedged. There was no doubt that the heart failure was precipitated by the pendant position and not vice-versa.

In the late afternoon on December 26th the weather in Toledo was cold and snowy. Evidence from various sources indicated that the deck plates of the Gypsum near the gangway, which slanted slightly toward the side of the ship, were covered with snow and ice, and were slippery.

The post mortem included a blood alcohol test. The test, conducted by the Toledo Police Department Crime Laboratory showed a blood alcohol level of .28%. In this regard, the Deputy Coroner testified that a reading of .32% is invariably fatal, and that when the level reaches .26% ordinary people become unconscious. Other experts disputed these conclusions. Evidence also established that alcohol metabolizes at the rate of .01% per hour in the human body, so that decedent's blood alcohol level at the time he first became wedged must have been .29% or higher. Further, there was expert testimony that it is possible for alcohol in the stomach to diffuse into the blood after death and cause a higher and deceptive test reading.

The District Judge, sitting as trier of fact, found that in the late afternoon of December 26, 1970, "decedent left his cabin with the intention of meeting his wife; that at the time the deck of the Gypsum was slippery, covered with fresh snow, and the visibility was very poor; that shortly before he reached the gangway, decedent slipped, and in the absence of any useful railing on the edge of the ship at that point, was unable to save himself and plunged head first down between the two vessels; that he was rendered unconscious by the impact with the ship's hull at the end of his fall, and remained there, with his head downward, until death ensued, about two hours later."

The Trial Court first decided that the decedent was entitled to proceed under the Jones Act. It then concluded that appellant had violated a Coast Guard Regulation relating to the maintenance of railings and held appellant liable for decedent's death.

■ Appellant's main assignment of error relates to the District Court's decision concerning the applicability of the Jones Act. Appellant maintains that at the time of decedent's fall the Gypsum was "out of navigation," laid up for the winter, was a "dead ship," and that as a matter of law the Jones Act was inapplicable. It cites Antus v. Interocean S.S. Co., 108 F.2d 185 (6th Cir. 1939); Nelson v. Greene Line Steamers, Inc., 255 F.2d 31 (6th Cir.), cert. denied, 358 U.S. 867, 79 S.Ct. 100, 3 L.Ed.2d 100 (1958), and a number of other cases to support the proposition that a Great Lakes steamer in the proc-

ess of being "laid-up" for the winter is not "in navigation" and the men aboard are not entitled to Jones Act rights. However, as this Court recently re-affirmed in Noack v. American S.S. Co., 491 F.2d 937 (6th Cir., filed February 1, 1974), the question of whether a vessel is "in navigation" is a question of fact properly left to the trier of fact. Absent a finding that the determination made was clearly erroneous, it must be upheld on appeal. Applying the criteria detailed in *Noack*, we conclude that the District Court's determination that the Gypsum was "in navigation" was not clearly erroneous.

■■ Appellant asserts that the Trial Court erred because it engaged in surmise, speculation, and conjecture to fix liability for this unwitnessed and unexplained accident. The Supreme Court has stated that the test to be applied in determining the permissible inferences from unexplained events in cases arising under the Jones Act is to be the same as that applied in F.E.L.A. cases. Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1956). That test is "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1956). The rule was recently reaffirmed in this Circuit. Rodriguez v. Delray Connecting R.R., 473 F.2d 819 (6th Cir. 1973). The trier of fact is thus allowed "a measure of speculation and conjecture . . . to settle the dispute by choosing . . . the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1945). Under these tests, the conclusions reached by the trial court were premised upon permissible inferences.

■ The trial court found appellant liable because it violated Coast Guard Regulation 92.25–5(a) which states that "All vessels shall have sufficient guard rails . . . . ." C.F.R. 92.25–5(a). Appellant contends that the above regulation does not apply to "Any vessel while laid up and dismantled and out of commission," C.F.R. 90.05(a)(3), and even if this exception is inapplicable the hemp rope was an efficient guard. With respect to the first contention, the District Court held that at the time of decedent's death the Gypsum was not "laid up and dismantled and out of commission," but rather was *in the process* of being laid up, dismantled and decommissioned by a crew of which decedent was a member. In addition, we note that during the lay-up process a large crew is aboard, but when the process is completed, only a single watchman remains aboard and he performs only guard duties. We conclude that the District Court correctly determined that the exception had no application in this case.

■ As to the claim that the hemp rope was an "efficient guard rail," we hold that its efficiency was a question of fact. There was probative evidence of its inefficiency, and the finding that it was inefficient was warranted under the evidence. And, while it is true that the regulation regarding guard rails can be waived by the Coast Guard after inspection, this does not change the mandatory nature of its command. There was no waiver in this case, but there was a clear violation.

■■ The Trial Judge found that at the time of his fall decedent was sober but weak and ill, a finding directly in conflict with evidence offered by appellant concerning the blood alcohol test. Appellant asserts that the rejection of competent scientific evidence constituted error. There was, however, contradictory evidence relative to decedent's condition the day of the accident and to his drinking habits in general. Further, some doubt was cast upon the "scientific" evidence by the testimony that at the alcohol level allegedly present in decedent's blood at the time of his

fall an ordinary man would be unconscious. Also, there was evidence indicating that decedent was taking drugs for his stomach disorder. The question thus presented pertains to the weight assigned by the trier of fact to the blood alcohol test. The weighing of evidence is a function of the Trial Judge in a court tried case and his decision cannot be set aside unless clearly erroneous. Rule 52(a), Fed.R.Civ.P. In light of the contradictory evidence noted heretofore, we conclude that the rejection of the test evidence was within the sound discretion of the Trial Judge.

Appellant raises a number of contentions relating to the computation of damages. We have reviewed these contentions in light of this Court's holdings in the so-called *"Cedarville"* cases, United States Steel Corp. v. Lamp, 436 F.2d 1256 (6th Cir.), cert. denied, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971); and United States Steel Corp. v. Fuhrman, 479 F.2d 489 (6th Cir.), cert. denied, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973), and found them, with one exception, meritless. The exception involves the District Court's inclusion of "sums payable by the defendant for fringe benefits" in the computation of decedent's future earnings. The District Court included an amount equal to the sums that appellant would have paid into decedent's pension fund and other fringe benefit plans over the remainder of his work-life expectancy. Appellant urges, and we agree, that this was clearly erroneous.

 As we stated in *"Cedarville,"* 436 F.2d at 1272, "The primary element of pecuniary loss to the families of the deceased seamen is, of course, the loss of the decedent's earning capacity . . . for the remainder of the decedent's work-life expectancy. The basic factor of the lost earning capacity is the monetary wage which the decedent would have earned had he lived, but may also include the value of those fringe benefits which would inure to the benefit of decedent's family had he lived." In the case before us, decedent's wife is entitled to claim that percentage of his pension and other benefits that she would have received had he lived to his full work-life expectancy, not what his employer would have paid into the plans. The award must be recomputed in accord with the foregoing principles.

The judgment of the District Court is affirmed except insofar as it relates to the computation of damages, and the cause is remanded for further proceedings consistent with this opinion.