**Rex W. HUGHES, Plaintiff,**

v.

**CONTICARRIERS AND TERMINALS, INC., Defendant.**

**No. 89 C 2712.**

United States District Court, N.D. Illinois, E.D.

Nov. 21, 1990.

Leonard C. Jaques, Danes B. Jaques, The Jaques Admiralty Firm, P.C., Detroit, Mich., for plaintiff.

Robert Nienhuis, Goldstein & Price, St. Louis, Mo., D.J. Sartorio, (Local Counsel), Tribler & Marwedel, P.C., Chicago, Ill., for defendant.

**MEMORANDUM OPINION AND ORDER**

PARSONS, District Judge.

In this case the plaintiff, Rex Hughes, was injured when he fell off the tug boat *Conti–Karla* into the Mississippi River on June 28, 1986. Hughes filed suit against

ContiCarriers and Terminals, Inc., the owner of the tug, seeking compensatory and punitive damages under the Jones Act, 46 U.S.C.App. section 688 and under general maritime law. This case was tried to both the court and the jury. After both sides had completed presenting their evidence but before the case was argued to the jury, the plaintiff moved for a directed verdict, claiming that the vessel, at the time of the accident and under the circumstances, was unseaworthy as a matter of law. This finding would remove from the jury any question about negligence and allow the court, sitting in Admiralty, to hold the defendant shipowner totally liable to the plaintiff, i.e. liable for all consequential damages suffered by the plaintiff as a result of the accident. The court took the motion under advisement and in the meantime sent the case on to the jury. After the jury returned a verdict of no liability, the still pending motion for directed verdict became a motion for judgment notwithstanding the verdict, the issue to which the court directs its attention in this memorandum.

After the jury was selected and throughout the trial of the case there was on display in front of the court and the jury, with consent of the parties, a four foot model of the Conti-Karla. It is a relatively large twenty year old river tug that has been used since its launching to maneuver flotilla of loaded barges on the Mississippi River and its tributaries. When in tow assemblies of three to thirty barges are arranged in tight parade formation in front of the Conti–Karla, with the tug pushing the package of barges from a position in the center of its rear. The barges are held together in tight formation and controlled from the rear by steel cables called facing wires that stretch out from two sets of large steel spindles mounted on the front deck of the tug between the cabin and its squared-off prow, each set a few feet back from each corner of the deck. When the tug is not in tow the crew keep these facing wires stretched backwards from their spindles along the narrow decks between the cabin and the edges of the sides of the tug.

These facing wires obviously are strong long cables of steel wrapped in steel strands approximately an inch or more in diameter. The strands with which they are woven are themselves quarter-inch wires of wrapped strands which, as they age from heavy use, break off at points along their stretches, leaving hooks and snags referred to by the parties in this case as burrs. When they are not in use up and around the barges they are, as stated above, stored by being stretched as well as they can be from their spindles back along the starboard side and portside decks of the tug between the tug's cabin and its edge. Because of the width of the cabin these decks are relatively narrow—only a few feet in width. For purposes of the safety of members of the crew moving or working on these narrow side decks there are wooden banister styled railings bolted to the sides of the cabin, and along the edges of the tug there is along the side of each deck a cable threaded through the upper ends of waist high posts like a single steel cord banister. The bottoms of the posts are hinged in their moorings to the deck's edge so that section by section these safety cables and their uprights can be let down along the edges of the tug wherever work needs to be performed beyond the edge of the deck.

For example, when refuelling the tug, a task performed on the port side, sections of these safety lines can be let down so that there can be free movement between the tug's deck and the fuel service dock. Similarly, when facing wires are moved from their storages along the port and starboard decks to be stretched out and around the flotilla of barges, these boat edge banisters, like safety cables, can be let down section by section as far back as needed to enable the crew to move the facing lines over the decks' edges to their fastening positions on the barges. Generally, after the facing wires have been moved from their storages along the decks to their fastenings on the barges, the safety cables are returned with their uprights to banister positions.

The controlling facts of the incident heard by the jury are these. The tug had

secured the tow barges several miles up stream and had left them to return six miles to a facility for refueling. The accident happened while it was docked there with its port side adjacent to the dock and its starboard side facing the open waters of the river. The refueling required that the safety line be down on the port side of the vessel but the safety lines were down on both sides of the vessel. They had been taken down back when the tug was detached from its tow so that it could go back stream alone to refuel. It was necessary when preparing for the tow to retrieve the facing wires from the barges and bring them aboard by stringing them temporarily along the narrow board walks on both sides of the cabin. The men who worked with them left the safety lines down on both sides of the tug there to remain not only during the refueling but as well during the time when the tug would be proceeding alone through the waters of the river to and from the refueling docks.

A shift change in the crew and its command occurred while the tug was still at the refueling dock. It was the Pilot, the man in charge of the crew alternatively with the captain so that the captain could have rest periods, the plaintiff in this case, who when coming on duty on his shift saw that the safety line on the side of the tug open to the river, the starboard side, was down. There is some evidence that he ordered his men to put it up again, and when shortly thereafter, he found that his order had not been obeyed, rushed down to himself put the safety line back. In doing this he descended from the pilot room by the ladder which placed him on the deck near the spindle from which the face wires on the starboard side of the vessel were stretched. He was at the point farthest from the place at which it was necessary to begin returning the starboard safety line to its upright supports. Had he, after leaving the pilot room, crossed the ship on the roof of the cabin and descended the ladder to the deck near the stern of the vessel, he could have proceeded re-securing the safety line from beyond the ends of the face wires as they lay strung back from their mooring spindle in the fore of the ship.

Instead, by beginning where he did he would be giving himself the task of proceeding along the stretches of the twisted face wires back to the position beyond the far end of them where he could begin replacing the safety line to its upright posts. He chose to make a trip stepping over and around twists and turns of the full length of the stretches of the face wires without the protection of the safety line along the edge of the ship instead of approaching the face wires from beyond their ends and returning the safety line ahead of himself as he would be proceeding over and around the twists and turns of the face wires. In taking his first steps back along the face wires where none of the safety line was up and available for his safety, the plaintiff became entangled in the facing wires and fell into the river, suffering in the fall the extent of his injuries.

\* \* \*

In deliberating over granting a motion for judgment notwithstanding the verdict, the court must

"... consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper ... [t]here must be a conflict in substantial evidence to create a jury question."

—*Boeing Co. v. Shipman* 411 F.2d 365, 374–5 (5th Cir.1969)

This requires the court to consider very carefully the facts involved in the case and come to a conclusion concerning the question of seaworthiness in this case.

\* \* \*

So this is a maritime case that was tried simultaneously under both traditional remedies of seaworthiness and the Jones Act. The plaintiff was a member of the crew. As stated above, he was the vessel's pilot. The accident occurred during the performance of his job and the incident related to a

routine duty: that of restoring a safety line to its functional position after it had been let down to permit the storing on deck of the face wires which had been used to secure the vessel, a tug, to the barges it had been pushing in a routine tow. Normally, these facts would indicate the application of the law of the sea rendering the owner of the tug absolutely liable for any injury to a member of the crew whose injuries resulted from any reasonable degree of inadequacy of the ship's equipment. But here the vessel (the tug) was tied-up alongside a dock for refueling purposes, and a serious question arises as to whether under the circumstances the use of the Jones Act of 1920, which recognizes the concept of comparative negligence, is an appropriate jury question, i.e., assigning relative liabilities between the ship owner and the seamen even when the ship-owner preliminarily had allowed the seaman maintenance and cure.

Tugs operate primarily on navigable streams (in this case the Mississippi River), where their crews often perform as much harbor workers duties as they do the duties of navigation. Often where personal injuries occur during the performance of such duties questions arise requiring an analysis of the facts for determining whether to apply the traditional law of the sea or the modified law that developed with the rise of organized labor during the years following World War I, and the enactment of the Jones Act. Pleading thus in the alternative became usual, and recorded case law finds courts on both sides of the question, leaving little consistency in precedence. The recorded cases have come predominately from the circuits bordering upon the oceans and the Gulf of Mexico.

In reviewing the vast array of decisions reported over the last half century growing out of the use of vessels on waterways not involving the high seas, seeking guidance as to the application of the traditional concepts of admiralty and maritime law, and in particular the concept of seaworthiness that involves the absolute liability of the ship owner, one is impressed by the small number of reported decisions from the district courts and the appellate court for the

Seventh Circuit. The Seventh Circuit like the Sixth Circuit has a much more limited exposure to navagable waters than have the circuits bordering the Atlantic and Pacific Oceans and the Gulf of Mexico. The circuits with the largest numbers of reported cases are the first five circuits and the ninth. Those circuits and their district courts have left a disturbingly non-pattern of precedents in what appears to be their efforts to adjust the older role of admiralty and maritime jurisdiction to the concerns of Congress during the early years of this century for the growth of labor unionism and the balancing of interests between industrial management and organized labor and with the super-imposition of concepts of comparative liability upon the centuries-old law of the sea in a manner to permit both of them to survive. And where the plaintiffs in the cases have been career workers engaged in the on-shore industrial use of off-shore transportation, they have, as in the instant case, been bringing the cases they have against shipowners in the alternative, seeking relief under either admiralty and maritime law or basic tort and contract law as the same has been implemented by Congress, as in the Jones Act and the Harbor Workers Act.

The "Executive Jet's formula," often quoted in these cases, set the path being followed now. It is that when determining to employ maritime jurisdiction under 28 U.S.C. § 1333(1), (the jurisdiction statute by which Congress specifically granted federal district courts jurisdiction over "[a]ny civil and admiralty or maritime jurisdiction) ... the wrong [must bear] a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 253–254, 93 S.Ct. 493, 497–498, 34 L.Ed.2d 454 (1972).

Most recently the Supreme Court has emphasized an accommodating availability of admiralty law to navigable waters problems here in the Seventh Circuit stating, that "... it is sufficient for such jurisdiction when the activity out of which the incident occurred arises not from the particular circumstances of the accident but from the general relationship of the vessel

employment to the traditional maritime activity." (*Session v. Ruleg,* Sup.Court No. 88–2041 June 25, 1990 at page 6.)

Absolute liability of the owner where unseaworthiness is found is a difficult concept for a jury, as indeed it sometimes has proven difficult for the courts. This accounts for so many cases which show reluctance on the part of the courts to accept as absolutely fair the concept in tort, where the complainant is an employee performing duties on board, of total owner responsibility. A review of the more recent decisions shows a drifting toward admiralty that has occurred during the last 40 years. The majority in *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 547, 80 S.Ct. 926, 931, 4 L.Ed.2d 941 (1960) writing in the face of many pages of persistent dissent, observed that: "During the two decades that followed the *Carlisle* [*Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922)] decision there came to be a general acceptance of the view that *The Osceola* [189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903)] had enunciated for American maritime law the concept of absolute liability for unseaworthiness unrelated to any principles of negligence law ...; [and] that (thereafter) [P]ersonal injury litigation based upon unseaworthiness became substantial."

I observe that according to the more recent textual material on Maritime Law, and separate and apart from other areas of labor law, the concept of absolute liability for unseaworthiness is worthy of the law today. It is stretching reality to suggest that the crystallization of this trend in legal literature has not been in some respects due to a growing reality that at least in this and similar areas of tort law the concepts of negligence and comparative negligence just are not capable of adjusting to the relationship that justly and fairly ought exist between carriers by water "or by air" and their employees. The concept of absolute liability in these areas unlimited by growing concern in employer-employee relations in industry for the dictates of comparative and relative negligence, has justly been found to be and is in fact grounded in fundamental fairness.

For example a vessel, which as a whole was fully manned and had on board a competent third mate, nevertheless became unseaworthy when that third mate assigned two men, instead of three or four, to uncoil a heavy rope and carry it 56 feet to the edge of the ship. *Waldron v. Moore-McCormack Lines, Inc.,* 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967).

■ In this case it makes no difference that the defendant was himself the ship's Pilot. It is no defense for the owner to say that the selection of the crew (or a particular member of the crew) to perform a task is left to the discretion of the master. The master becomes the representative of the owner when it comes to selecting a competent seaman to perform a duty. *Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955). A vessel becomes unseaworthy when the standard of disposition and seamanship of any member of the crew is not maintained, thereby endangering the vessel or persons aboard. *Id.* Living and working conditions aboard ship proximately causing or contributing to the seaman's injury will make the vessel unseaworthy as to him even under conditions that would not be considered unsafe on land—such as the absence of a handle or rail (even in a shower bath—to keep the showering sailor from slipping on slippery floors.) *Moore v. The O/S Fram,* 226 F.Supp. 816 (S.D.Tex.1963).

■ Unsafe working conditions are well established as basic to total shipowner liability. Where the plaintiff was hired just to repair the source of a ship's unseaworthiness the owner's liability attaches. *Bruszewski v. Isthmian S.S. Co.,* 163 F.2d 720 (CA 3rd 1947); *McCoy v. U.S.,* 689 F.2d 1196 (CA 4th 1982).

The Eleventh Circuit in 1985, in *Deakle v. John Graham & Sons,* 756 F.2d 821, explained that under admiralty law we may not limit the unseaworthiness doctrine of absolute liability by such conditions as are regular in land cases involving notice and fault. In that case wherein there was a directed verdict for the plaintiff, the captain of the shrimp boat serving the off

shore business of the defendant's industry was injured as a result of a sudden, savage and unprovoked assault of another member of the crew. The vessel was in traditional navigation work and absolute fault attained against the ship owner.

Recent cases similar in fact to this case have readily applied the traditional concept of unseaworthiness. In *Burden v. Evansville Materials, Inc.*, 636 F.Supp. 1022 (WD Ky.1986) aff'd 840 F.2d 343 (CA 6, 1988), the Sixth Circuit approved a "barest margin" of evidence approach to a case involving the facing wires on a tug. The plaintiff, a deckhand on a tug, was ordered by the captain to move two stacks of coiled wires out of the way on the deck. He injured his back while doing so and in the suit he claimed that the nature of these wires required two men rather than one for the job. Another court concluded, using the "barest margin" of evidence rule (see *Baczor v. Atlantic Richfield Co.*, 424 F.Supp. 1370 (E.D.Pa.1976), that facing wires with shackles attached constituted an inherently unseaworthy condition. They have a propensity to "snag" or "catch" on other coils. This alone hindered the plaintiff in his task. Thus the moving of the cable from the tow boat to the barge involved an inherently unseaworthy condition and became the proximate cause of the accident.

The Court of Appeals for the First Circuit, in 1984 found a failure on the part of the trial court to find unseaworthiness reversible error. This was a situation in which a seaman was carrying down to the "stop chest" below two boxes of soft drinks to be served to the crew from the main deck. Because the boxes themselves were not the type of containers essential for this type of trip on the shoulders of a seaman, the ship was unseaworthy as a matter of law. *Martinez v. Sea Land Service, Inc.*, 763 F.2d 26 (1st Cir.1985).

The salient facts of the instant case (in addition to those mentioned earlier) are these. During the time the *Conti–Karla* was away from the barges it had been towing, away on a mission of refueling, the face wires that had been used during the

tow were on the deck. This made footing hazardous. The safety lines on both sides of the tug were down. They were not only down during the refueling but throughout the entire refueling excursion. The fact that the boat had safety lines was a tacit acknowledgement by the owner of the hazards inherent in the design, construction, the use and the management of the tug. Finally, although it may have been necessary to have some of the safety lines down during the actual refueling process on the port side of the ship, there was no purpose served by having the safety wires down on the starboard side throughout the trip, where no work was being performed and where the walkway was exposed to the open waters.

This was inherently and unnecessarily dangerous and this the defendant must be held to have acknowledged. One crew member warned the plaintiff as he started his trip back from the front along the starboard side, that it was dangerous. The company acknowledges that as a matter of custom it depends upon the agility and experience of the crew in moving about on the board walks of the deck under these circumstances. This testimony is irrefutable evidence of the inherent dangerousness of this custom, and when from use the facing wires are allowed to become bent and curled with loops in them they should be replaced with new ones. The condition of the lowered safety line itself rendered the vessel at that point unseaworthy. Had the plaintiff ordered a member of the crew to approach this task from the same position, he would have compounded the unseaworthiness of the vessel by his direction to a member of the crew to perform the task in the same direction he himself had started to perform it. This unseaworthiness relates back to and becomes a part of the fault of the vessel. The evidence is that this condition of continuous danger that need not have existed was permitted and became a condition known to the defendant from ownership and management down through the officers and crew of the ship through whom the defendant acted. When working with the face wires, either to couple the barges to the tug, or to return the

face wires to their parking place when not being used—along the walkways on both sides of the tug, the safety line has to be taken down. When there is no reason to work with it down the safety line should be up. There is no reason for leaving the safety line down when work is not being performed requiring it to be down. Yet, according to the testimony even of the defendant's witness, leaving the safety line down between the upfacing and facing up of the barges was a habit, a custom. Apparently experienced seamen knew this and compensated for it by avoiding using the walkways or being agile in their using them when the facing wires were stored on deck and the safety lines were still down. The captain of the tug himself conceded that leaving the safety lines down under the circumstances of this incident was not necessary but was the usual way.

Under the doctrine of unseaworthiness the ship owner has had the absolute duty to correct this practice or be totally responsible for all injuries suffered by any member of the crew who would stumble and be dragged overboard by sliding facewires, no matter how contributorily negligent the crew member might have been. Under the law of the sea this is an absolute liability that attaches to an unnecessary but hazardous condition. This is more than the doctrine of liability even without fault. There is fault here when the owner of the vessel is aware of or fails to find out about a natural hazard and does nothing about it.

In this case the jury answered only the first two of the five interrogatories on the verdict form and then it proceeded on to sign and return a verdict for the vessel and its owner and against the injured pilot of the boat. The first interrogatory was: "Was defendant Conti Carriers and Terminals, Inc. (the owner of the boat) negligent?" Following that question was this instruction: "If your answer ... was (NO), ... go on to the Interrogatory No. 2" The jury's answer was "No." Interrogatory No. 2 was: "Was the M/V Conti Karla (the defendant's boat) unseaworthy?" Following that question, one of the instructions the verdict form gave was this: "If your answer to Interrogatory No. 2 is (NO) and your answer to Interrogatory No. 1 was also (NO), proceed no further ... and have [the verdict] signed and dated ... and return(ed) ... to the Court." This is what the jury did. It was their verdict absolving the defendant of any and all liability to the plaintiff for his injuries. Obviously, the jury, doubtlessly dismayed by testimony of a medical expert presented by the defendant casting serious doubt as to the truth of the extent of plaintiff's claimed injuries, closed the door on him completely.

## CONCLUSION

This court has concluded that the Court of Appeals of this Circuit and generally the district courts herein have, to the extent they have expressed themselves, taken a strong position similar to that of the Fifth Circuit, allowing the use of the rules of traditional admiralty and maritime law by seamen engaged in the manning of and operation of vessels in its navigable streams, as differing from that available to employees working off of docks and in factories serviced by those vessels. It is true as defendant points out, that there are numerous cases in the casebooks which, when finding unseaworthiness, are concerned with circumstances far more obvious than the circumstances in the instant case: cases involving the absence of lifeboat equipment, the lack of an adequate crew, the falling down of a ladder while the plaintiff was on it, the pilothouse door slamming shut on a seaman's hand; but the law of the sea has adjusted to accommodate the law of comparative negligence in litigation wherein employer-employee relation are more related to harbor work than to characteristically navigation work.

Even if refueling at a dock involves less navigation than other work, the testimony of the general manager to the effect that the safety line must be detached where work is being performed across the edge of the vessel, ignores the fact that at the time of the accident the work being performed or that had just been performed requiring a lowering of the safety line, had been or was being performed on the port side of

the vessel, and not on the starboard side where the accident occurred.

The testimony of this same general manager as well as that of defendant's expert, Admiral Owen Siles, to the effect that it was appropriate to detach the safety line while the vessel was harbored at a port for refueling fails to address the issue of why would the safety line be down in the very side of the deck that was not being used for refueling. This testimony failed to answer the question as to why it was the program of the tug to leave the safety lines down not only while the vessel was refueling, but also during the entire navigation period involved in the refueling trip—including all of the six miles travelled from the flotilla of barges to the refueling dock. The testimony of crew members Rayform and Watson that the handrail and other objects secured to the bulkhead of the cabin were available to hold on to conflicted with the fact that the owner itself had seen fit to make available these same safety lines to assist the person moving along the side of the deck adjacent to the water. And of course defendant's suggestion that there was no evidence that the safety line was broken or nonfunctional is oblivious of the fact that it was no more functional lying down on the deck than it would have been had it been unbroken.

Whether this condition, which the plaintiff had sought in an incorrect way to correct, was purposely or accidentally left that way by the captain of the vessel when he went off duty, his failure to correct it was the tug's failure, and the failure of the pilot when coming on duty to use safe methods in correcting it, were also the ship's failures and improprieties. And the fact that the person injured as a result of these failures and improprieties was himself the ship's alter-ego does not absolve the vessel of total responsibilities for the injury the plaintiff experienced. This is what the court meant in the course of the trial when it observed that the "vessel was inherently unseaworthy." It has the same impact after the trial of the case.

Judgment notwithstanding the jury's verdict is entered for the plaintiff and against the defendant on the matter of liability, and the case will be set down for re-hearing before the court on the issues of damages.

IT IS SO ORDERED.