**Rex W. HUGHES, Plaintiff–Appellee, Cross–Appellant,**

v.

**CONTICARRIERS AND TERMINALS, INC., Defendant–Appellant, Cross–Appellee.**

Nos. 92–1601, 92–1874 and 92–2047.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1993.

Decided Sept. 20, 1993.

Leonard C. Jaques (argued), Jaques Admiralty Law Firm, Detroit, MI, for plaintiff-appellee.

D.J. Sartorio, Michael R. Stilf, Tribler & Orpett, Chicago, IL, Alan K. Goldstein, Robert Nienhuis (argued), Goldstein & Price, St. Louis, MO, for defendant-appellant.

Before CUMMINGS, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

River towboats push rather than tow their cargo. M/V CONTI-KARLA, built in 1980, was designed to push fleets of 15 or more barges on the Mississippi. Maneuvering a chain of barges, with power from far astern, is possible only if the barges are lashed tightly with

steel cables, to each other and to the towboat. Cables between the bow or face of the towboat and the closest barge are called facewires. Towboats sit low in the water, while barges may ride higher, especially if unladen. To prevent it from driving under the barges, a towboat has a pair of sturdy pillars, usually called towknees, rising above its blunt prow. The CONTI-KARLA looks like this:

As the photograph shows, there is a narrow walkway 2 to 3½ feet wide between the vessel's cabin and the water. Crew who must work outside may hold onto the banisters attached to the cabin. Like most modern towboats, the CONTI-KARLA also is equipped with a safety line around its perimeter. The nylon line begins at the towknee and runs through upright stanchions around the vessel. These stanchions may be low-

ered in order to get the safety line out of the way when members of the crew need to work nearby, so that the men won't constantly be stepping over the line—a hazard as well as an inconvenience. Parts of the lines come down when the towboat is coupling or uncoupling from the barges, when the crew is connecting or disconnecting fuel or water hoses, or taking on supplies, and so on.

On June 28, 1986, the CONTI-KARLA unfaced from her tow of barges so that she could refuel. The procedure entails taking the barges to a fleeting area and removing the facewires that join the towboat to the closest barge. These heavy steel cables are too rigid to take up on a winch and spindle, so the crew of the towboat places the cables in the long walkways between the cabin and the water. (The CONTI-KARLA is 115 feet from stem to stern, so there is plenty of room.) After unfacing from the barges, the CONTI-KARLA docked three miles away to take on fuel and water. The CONTI-KARLA'S port side adjoined the dock. While unfacing from the barges and tying up at dock, the CONTI-KARLA was under the command of Captain Oscar Bechard. At noon that day command passed to Rex W. Hughes, the pilot, who was in charge of the next watch. (The CONTI-KARLA carried two full complements, alternating in service, so that it could operate 24 hours a day.)

When Hughes began his watch, the CONTI-KARLA was securely tied to the dock. The weather was sunny and calm. Hughes noticed that the section of the safety line from the starboard towknee to the first stanchion was down. It had been lowered during the unfacing, and the crew had not put it back up. Hughes shouted to one of the seamen to put the line back in position. Apparently the seaman did not hear the order. Instead of using the vessel's intercom to repeat the command, or walking closer to the seaman, Hughes decided to restore the safety line himself. As he was walking toward the line he tripped over the facewires and fell overboard.

Hughes filed this suit under the law of admiralty and the Jones Act, 46 U.S.C.App. § 688. The maritime action was based on the requirement that the vessel be seaworthy. The Jones Act claim asserted that the employer was negligent. A jury, answering special interrogatories, determined that the vessel was seaworthy and that its owner, ContiCarriers and Terminals, Inc., had not been negligent. The district court granted judgment for Hughes on the admiralty claim notwithstanding the verdict, 753 F.Supp. 221 (N.D.Ill.1990), and later awarded damages of $813,000, *Hughes v. ContiCarriers and Terminals, Inc.,* 1992 WL 32882. The judge reasoned that because the doctrine of unseaworthiness is a species of liability without fault, any injury on the vessel is compensable: "The concept of absolute liability in these areas unlimited by growing concern in employer-employee relations in industry for the dictates of comparative and relative negligence, has justly been found to be and is in fact grounded in fundamental fairness." 753 F.Supp. at 225. Yet admiralty does not include a workers' compensation program parallel to the Longshore and Harbor Workers' Compensation Act, which covers dock workers. Seamen did not give up the tort measure of damages and receive broader coverage in return. Although the doctrine of unseaworthiness entails liability without fault, there must still be a defect in the vessel. "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). See also *Morales v. Galveston,* 370 U.S. 165, 170, 82 S.Ct. 1226, 1229, 8 L.Ed.2d 412 (1962); *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94–95, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946). A seaman must show that an unsafe condition on the vessel caused his injury; dispensing with the need to prove that some "fault" led to this condition does not dispense with the need to establish that there was one.

Portions of the district court's opinion suggest that Hughes' own inept effort to restore the safety line was the unsafe condition: "Whether this condition, which the plaintiff had sought in an incorrect way to correct, was purposely or accidentally left that way

by the captain of the vessel when he went off duty, his failure to correct it was the tug's failure, and the failure of the pilot when coming on duty to use safe methods in correcting it, were also the ship's failures and improprieties." 753 F.Supp. at 228. Hughes does not defend the conclusion that his own errors support recovery; his negligence not only is not attributed to the vessel but also could be the basis for reducing an award otherwise justified. *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939); *Chotin Transportation, Inc. v. United States*, 819 F.2d 1342, 1354 (6th Cir.1987); *Van Nijenhoff v. Bantry Transportation Co.*, 791 F.2d 26, 27 (2d Cir. 1986); Norris, *The Law of Seamen* § 27:19 (4th ed. 1985). That is to say, admiralty recognizes the doctrine of comparative fault, which would be destroyed (and the system converted to one of workers' compensation) if the sailor's negligence were imputed to the vessel.

■ Hughes' own theory is that both the facewires and the guard lines were in an unsafe condition—the facewires because they were so worn that burrs entangled his leg and caused him to lose his balance, and the guard line because it was down, so that he could not grab something to stop the fall. The jury rejected these submissions, and we must now take the evidence in the light most favorable to the verdict. *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 358–59, 82 S.Ct. 780, 782–83, 7 L.Ed.2d 798 (1962); *Tennant v. Peoria Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). Several witnesses testified that the facewires were in good condition, looped and bent (thick steel cables do not lie straight and flat after they have been bent and subjected to tension) but not burred. Hughes insisted that they were inordinately worn and frayed, with projections that would snag passing trousers, but the jury did not have to accept this evidence. Thus Hughes' claim depends on the fact that the safety line was down. The crew properly took it down while unfacing from the barges and, all witnesses agreed, should have put it back up before leaving the fleeting area. According to Hughes, this supplies the necessary unsafe condition.

If Hughes had fallen overboard while the towboat was under way, he would have a solid argument. But he did not; he fell while the vessel was at rest. Evidence at trial conflicted on the question whether a vessel at dockside is unsafe when the safety lines are down. Hughes and his witnesses testified that safety depends on the lines being up unless the crew is then performing an operation (such as unfacing from the barges) that requires them to be down. ContiCarriers presented substantial contrary evidence. We mention only some of it.

Its star witness was retired Admiral Owen Siler. Between 1971 and 1974 Admiral Siler was District Commander of the Second Coast Guard District, which supervises inland navigation. Later he became Commandant of the Coast Guard. Admiral Siler testified that safety lines need not be up when a towboat is docked, and that there are good reasons for having them down—crew members moving back and forth in the vicinity otherwise would step over them, or put them up and down frequently, with greater risks than leaving them down. Admiral Siler stated explicitly that the CONTI-KARLA, tied up at dock with the safety lines down, was a "reasonably safe" place to work. ContiCarriers' experience reinforces this conclusion: several of its employees testified that the safety lines regularly are left down while its vessels are docked, yet in the history of the company (which operates 10 towboats) no one other than Hughes has fallen overboard.

ContiCarriers' general manager, with 30 years' experience in the industry (including almost every position from deckhand on up), testified that because the safety line can pose a danger while the crew is performing work with the facewires or in port, many towboats do not have such lines near the bow. Other witnesses gave similar testimony. A jury would have been entitled to discount this testimony, which came from ContiCarriers' managers and employees (and from an expert witness in ContiCarriers' pay), but the jury was also entitled to accept it—as it did.

Appellate judges ought not say that as a matter of law the views of the former Commandant of the Coast Guard on a matter of

maritime safety are unacceptable. Especially when the Admiral's testimony accords with the opinions of other appellate judges who have held that a safety line is unnecessary when a vessel is moored or in calm waters.

> Seaworthiness is a relative term; a vessel may have that quality in port, and yet be wholly unfit for rough water; and to say that the ship was unseaworthy because she had no handrail up, while lying alongside a wharf discharging cargo, is merely untrue.

*Hanrahan v. Pacific Transport Co.*, 262 F. 951, 952 (2d Cir.1919) (citation omitted). See also *Lester v. United States*, 234 F.2d 625, 628 (2d Cir.1956) (motionless vessel seaworthy despite lack of guard rails required by contract); *Newport News Shipbuilding & Dry Dock Co. v. Watson*, 19 F.2d 832, 833 (4th Cir.1927) (hand railing around deck house makes vessel seaworthy; outer hand railing would unduly interfere with operations).

Another route to the same conclusion does not depend on the relative worth of the testimony. The stanchions and safety lines were constructed so that the lines could be taken down and put back up. Unfacing from the barges is an appropriate occasion for having the line down. Hughes concedes that the crew properly took the line down at the fleeting area. The condition of "safety line down" thus does not automatically make the vessel unseaworthy. It means only that the line must be put back up. That is exactly what Hughes was trying to do when he fell. Hughes was not walking along the edge of the vessel, oblivious to the lack of a safety line; he did not rely on an apparently sound piece of equipment that failed. In *Villers Sea Food Co. v. Vest*, 813 F.2d 339 (11th Cir.1987), a ladder collapsed because the pins securing it in place had been removed, unbeknownst to the person trying to climb. Equipment that injures a sailor ignorant of its defect presents problems distinct from ours. Hughes knew full well about the condition of the line (and of the facewires). Given his concession that the towboat does not become unseaworthy the instant the line drops, and given the implication that putting the line back up is an ordinary task for the crew—one that can be performed in reason-

able safety when done properly—Hughes needed to show that it was more hazardous to restore the line in port than at the fleeting area. He did not try to do so, probably because he recognizes that it is less risky to handle the safety line while the towboat is lashed to a dock than when it is in open water. A captain might accept the greater risk of putting the safety line back up in the fleeting area in order to obtain the increase in safety that the line would provide while the towboat was in transit to the dock. A seaman who fell overboard while the vessel was underway thus would have a legitimate complaint. But Hughes did not fall victim to that risk. He was injured while trying to put the line back up. And that operation is not unacceptably risky.

To put this slightly differently, *someone* had to bear whatever risk inheres in raising the safety line while the facewires are on deck. The timing of the operation affected *who* bore the risk—a sailor on the morning watch, or a sailor on the afternoon watch— but did not increase the level of risk *to the person moving the safety lines*. Cf. William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 237–39 (1987). Both crews have seamen experienced in handling stanchions and safety lines, and the task is no riskier when done in the afternoon than in the morning. Hughes increased that risk by acting carelessly. As the district court observed, Hughes was carrying a case, so that he had only one hand free to move the line and balance himself, and he approached the stanchion the wrong way. (Hughes testified that he did not approach the stanchion from the proper direction because he was concerned that he would soil his shirt passing under a radio antenna.) That increase in risk is Hughes' own responsibility; it shows that he went about the task in an unsafe way, not that the task or vessel was unsafe. Cargo should be lashed during a storm yet may be unlashed in calm waters; a seaman who injured his back while stooping to lash a barrel at dockside could not argue that the ship was unseaworthy because the cargo should have been tied down at sea by someone else. Just so here. The jury's verdict should not have been disturbed.

The judgment is reversed. On remand the district court shall enter judgment on the jury's verdict.

CUMMINGS, Circuit Judge, dissenting.

Even if the events leading up to Hughes' accident are viewed in a light most favorable to ContiCarriers, the jury's verdict cannot stand because at the time of Hughes' accident the CONTI-KARLA lacked a rope guard rail, and this condition made it unseaworthy as a matter of law. I therefore respectfully dissent from the majority's opinion.

It is well established that a missing safety device can make a ship unfit for its intended use and hence unseaworthy. *Villers Sea Food Co., Inc. v. Vest*, 813 F.2d 339, 342 (11th Cir.1987); *Skipper v. Amerind Shipping Corp.*, 230 F.Supp. 253 (D.La.1964) (slack safety rope); *Scarberry v. Ohio River Co.*, 217 F.Supp. 189 (D.W.Va.1963) (defective handrail). At the time of Hughes' accident protective safety lines had not been in place for hours. Furthermore, ContiCarriers never tried to justify why these lines were down when the CONTI-KARLA sailed from where it "fleeted" its barges to the oil dock. Undisputed testimony at trial established that the safety lines should have been raised once the CONTI-KARLA was underway. One witness implied that when a boat is on a short refueling trip between tows it is not "underway"—but this is hair-splitting. The majority hints that a towboat would be unseaworthy if someone fell overboard when the boat was sailing and the safety lines were down for no reason. Therefore the critical question is whether it matters that Hughes' accident occurred after the towboat arrived at the refueling dock.

In this case it should make no difference that Hughes fell overboard after the vessel had come to a stop. Once ContiCarriers breached a plain, undisputed duty to raise the safety line when the ship was underway, it should be held liable for injuries resulting from that breach until the safety defect was cured. The majority suggests that once the CONTI-KARLA moored against a dock, it was no longer unsafe to have the safety lines down. This is true for the dock-side line— but false for the river-side line that would have prevented Hughes' fall. No witness

suggested that the starboard (*i.e.* river-side) line needed to be down for port-side refueling. This line should have been in position when Hughes fell because it should have been raised before the CONTI-KARLA sailed to the dock. There are simply no facts that would allow a jury to find that the starboard line was properly down at the time of Hughes' accident, or that the line's lowered position did not cause his injuries. "[E]ven though the equipment furnished for [a] particular task is itself safe and sufficient, its misuse by the crew renders the vessel unseaworthy." *Waldron v. Moore–McCormack Lines, Inc.*, 386 U.S. 724, 727, 87 S.Ct. 1410, 1412, 18 L.Ed.2d 482.

The CONTI-KARLA was unseaworthy as a matter of law because a vital safety device was missing from a hazardous deck area, and it would have prevented the injury if in place. *Villers*, 813 F.2d at 342; *Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir.1982), modified 702 F.2d 1023; *Oliveras v. American Export Isbrandtsen Lines, Inc.*, 431 F.2d 814, 816 (2d Cir.1970); *Gibbs v. Kiesel*, 382 F.2d 917, 919 (5th Cir.1967). ContiCarriers should not avoid liability merely because its boat was docked at the time of the accident. *Sweeney v. American Steamship Co.*, 491 F.2d 1085, 1089 (6th Cir.1974).

This result is supported by *Villers*, 813 F.2d at 339, which reviewed an unseaworthiness claim where pins designed to secure a ladder were removed, resulting in injury to the plaintiff when he climbed the ladder. The court granted the plaintiff judgment as a matter of law: "If a ship's equipment breaks under normal use, the logical inference that follows is that the equipment was defective. * * * The same presumption arises when a safety device is removed from a ship's equipment resulting in the type of accident which the safety device was designed to prevent." *Villers*, 813 F.2d at 342. This means that Hughes is also entitled to judgment as a matter of law, for here the safety lines were removed and this resulted in an accident which the lines were designed to prevent. Contrary to the majority's view, *Villers* does not turn on a seaman's knowledge of a defect that causes his injury. It does not matter that Hughes was trying to fix a defect whereas the *Villers* plaintiff was caught unaware, for ship owners may be held liable when

seamen attempt to repair a known defect that renders a vessel unseaworthy. *Comeaux,* 666 F.2d at 299.

The majority also argues that raising the CONTI-KARLA's safety lines when the boat is docked is no more dangerous than raising the lines as soon as the facewires are stowed on deck. While this may be true, it is irrelevant because Hughes would not have had to risk raising the starboard line if it had been properly in place when he began his watch. After today's decision the sloppy practice of sailing to refuel with safety lines lowered is given a false imprimatur of economic rationality. For even if the isolated risks of raising the line in the morning or the afternoon are equivalent, the overall risks of one practice or the other are not the same. When towboats sail with safety lines down, the risk of injury to the crew increases, and since it is no more costly to raise safety lines as soon as barges are fleeted, our rule should encourage behavior that produces less aggregate risk.

Finally, the majority suggests that Hughes' own negligent acts led to his injury. This discussion serves to make today's result appear more just, but it ignores admiralty's maxim that "a seaman's duty to protect himself is slight." *Ceja v. Mike Hooks, Inc.,* 690 F.2d 1191, 1193 (5th Cir.1982). The trial judge's well-reasoned opinion granting Hughes judgment notwithstanding the verdict should be affirmed.